IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| BETTY FULLINGTON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 09-3455-CV-S-ODS |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security. ) | |
| ) | |

## ORDER AND OPINION AFFIRMING COMMISSIONER'S FINAL DECISION DENYING BENEFITS

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying her applications for disability and supplemental security income benefits. The Commissioner's decision is affirmed.

## I. BACKGROUND

Plaintiff was born in April 1964, has an eleventh grade education, and has prior work experience is a poultry worker, shoe laborer, milking assistant, home health aide, nurse's assistant, and fast food worker. She last worked in June 2005 at a McDonalds, and quit after becoming depressed due to her husband's death. She filed her applications for benefits in October 2006, alleging an onset date of June 15, 2005.[1] Her arguments on appeal focus on her obesity, hyptertension, and joint and back pain.

At the times relevant to these proceedings, Plaintiff was 5'2" and weighed in excess of 250 pounds. Medical records from February 2003 confirmed arthritic wear in her right ankle. R. at 241-42. Tests performed in June 2005 demonstrated mild degenerative changes in both knees, calcific tendinitis in her left femur, and early indications of rheumatoid arthritis in her hands. R. at 319, 335. Records from August

---

[1]Plaintiff's insured status expired on September 30, 2008, so she must be disabled before that date to qualify for disability benefits.

2006 document osteopenia and degenerative changes in her right knee. R. at 262. A consultative examination performed in August 2006 confirmed the presence of hypertension and degenerative joint disease in her right knee. The consulting physician (Dr. David Paff) did not indicate Plaintiff's functional abilities; instead, he merely indicated she was "disabled." He also noted Plaintiff cared for her invalid mother, which required Plaintiff to occasionally lift her. R. at 249-51. In September 2006 Plaintiff was diagnosed with Type II diabetes. R. at 252. In April 2007, a consulting rheumatologist (Dr. Stanley Hayes) also noted degenerative joint disease and wrote that Plaintiff's "obesity is an aggravating factor for her lower extremities." Her hips had an "excellent range of motion," and her knees were "creptitant but not appreciably swollen with ful extension and flexion to greater than 130 degrees bilaterally." R. at 426-27. Similar opinions were rendered by an orthopedic specialist (Dr. Richard Seagrave), R. at 485-86, and crepitus in her knees was also noted on other occasions in 2007. R. at 368-69, 489.

In her filings on appeal, Plaintiff identifies Dr. Michael Ball as her treating physician, even though she identified Dr. Kenneth Dugan as her regular doctor during the hearing. R. at 33-34. The Court also notes there are significant gaps in Dr. Ball's treatment history: Plaintiff did not see Dr. Ball between May 2005 and October 2006 or between June 2008 and March 2009. In any event, Dr. Ball's records reflect that in February 2005 Plaintiff complained of arthritis in her hand, hip, and knee, and was told to use Tylenol. She requested something stronger, and when her request was denied she stated she would continue to buy meds off the street." R. at 454. In October 2006 he prescribed Tramadol for pain. R. at 456. In January 2007, Dr. Ball prescribed Tylenol #3, which contains codeine. R. at 457. The prescription was refilled in March 2007, R. at 458, but on July 20, 2007, Dr. Ball returned Plaintiff to Tramadol. R. at 460. On August 2, 2007, Plaintiff went to Dr. Dugan complaining of pain and reporting taking Tramadol and Tylenol. Upon questioning, Plaintiff admitted that she "might have had some Darvocet [approximately] 5 days ago." Dr. Dugan reviewed a computer database documenting prescriptions and learned that Dr. Elton Hoerning had prescribed Plaintiff ninety Darvocet on July 26. Upon examination Dr. Dugan found "no obvious deformities

2

to . . . knee, hips or ankles" and opined that Plaintiff suffered from chronic pain but that she was also exhibiting drug-seeking behavior.  R. at 369.

Plaintiff continued seeing both Dr. Dugan and Dr. Ball (and receiving prescriptions from both) until June 16, 2008.  At that time she stopped seeing Dr. Ball and did not see him again until March 16, 2009.  On this occasion, Dr. Ball completed two medical source statements purporting to assess Plaintiff's physical and mental capabilities.  On the MSS-Physical, Dr. Ball opined that Plaintiff could lift five pounds frequently and ten pounds occasionally, stand or walk for thirty minutes at a time and three hours total in a day, sit for fifteen minutes at a time and two hours per day, and was limited to varying degrees in her ability to push, pull, balance, reach , stoop, kneel, crouch or handle objects.  Significantly, Dr. Ball indicated Plaintiff could "occasionally" balance, which the form described as meaning she could balance "up to 1/3 of the time."  When asked to assess whether pain required Plaintiff to lie down, Dr. Ball indicated "unknown."  He wrote that Plaintiff's medication for diabetes, pain and hypertension might cause dizziness.  R. at 470-71.  On the MSS-Mental, Dr. Ball indicated Plaintiff was markedly limited in her ability to understand, remember, and carry out detailed instructions or to complete a workday or workweek.  He also indicated Plaintiff was moderately limited in her ability to remember locations and work procedures, maintain attention and concentration for extended periods, maintain attendance or a schedule, sustain a routine without special supervision, or adapt to changes or work independently.  R. at 473-74.

One other medical condition requires mention, although Plaintiff does not rely on it to establish disability.  In April 2008, Plaintiff was discovered to have an anterior communicating artery aneurysm.  R. at 375-77.  The neurosurgeon reviewing Plaintiff's test results opined that the aneurysm "is associated with a very low incidence of hemorrhage, we believe well less than 1%. . . . [W]e think that this aneurysm should just be watched."  R. at 379.

An initial hearing was held on February 18, 2009, but Plaintiff had not supplied medical records and other documents necessary for consideration of her claim.  The supplemental hearing was held on April 30, 2009.  At the supplemental hearing, Plaintiff

3

testified that the aneurysm caused her headaches that are so severe that three to four times per week she is unable to get out of bed and stays there for the entire day. R. at 35-36. She also testified that the aneurysm affects her balance, vision, and memory, causing her to "walk into walls" and making her incapable of sitting without losing her balance. R. at 36. Later, she attributed her inability to sit or stand to arthritis. R. at 36-37. She described her daily activities as getting up, helping her son (who was seven-years old at the time of the hearing) get ready for school, doing dishes and the laundry, and preparing meals. Plaintiff does the shopping for the family. She denied having any hobbies or participating in any activities outside of the home. R. at 45-46.

       The ALJ noted Plaintiff's body mass index (BMI) was in the range for "extreme obesity." R. at 16-17. The ALJ then considered this, along with the other evidence, to determine whether Plaintiff met or equaled listed impairment 1.02; the ALJ concluded she did not. R. at 17-18. The ALJ then considered Plaintiff's functional capacity. In doing so, the ALJ discounted Plaintiff's testimony about the extent of her pain and other problems because of inconsistencies in the Record. R. at 21. The ALJ also declined to accord substantial weight to Dr. Ball's medical source statements because (1) the MSS-Mental involved opinions outside Dr. Ball's expertise that were not supported by his treatment records and (2) the MSS-Physical was supported by only sparse records, and those records were inconsistent with the opinions contained on the MSS. R. at 22. The ALJ concluded Plaintiff could perform sedentary work with the following qualifications: she could sit for six hours and stand or walk for two hours in an eight-hour workday, required the ability to switch between sitting and standing every thirty minutes, lift five pounds frequently and ten pounds occasionally, avoid heights, uneven surfaces, extreme temperatures, and other hazards, and is limited to simple, repetitive tasks that involved no contact with the public and minimal contact with supervisors and co-workers. R. at 20. Based on testimony from a vocational expert, the ALJ concluded Plaintiff could not return to her prior work, but that she could work as an assembler or a table worker. R. at 24.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

### A.

Plaintiff first contends the ALJ failed to adequately consider her obesity in evaluating whether Plaintiff's condition equaled listing 1.02. She concedes obesity was mentioned, but faults the ALJ for failing to "explain why the combination of impairments" did not equal the listing. The Record demonstrates otherwise.

Listing 1.02 involves musculoskeletal impairments. The listing requires "gross anatomical deformity . . . and chronic joint pain and stiffness with signs of limitations of motion or other abnormal motion of the affected joints . . . ." If this condition is satisfied, the claimant must demonstrate either "[i]nvolvement of one major peripheral weight-bearing joint . . . resulting in inability to ambulate effectively" as defined elsewhere in the regulations. The ALJ noted an absence of evidence demonstrating limitation of motion or abnormal motion in Plaintiff's joints. The ALJ also properly discounted Plaintiff's testimony (as discussed below) regarding her ability to ambulate. Even with Plaintiff's obesity she does not meet or equal this listing.

5

B.

Plaintiff next argues the ALJ erred in failing to defer to Dr. Ball's opinion. Generally speaking, a treating physician's opinion is entitled to deference. "The treating physician rule is premised, at least in part, on the notion that the treating physician is usually more familiar with a claimant's medical condition than are other physicians." Thomas v. Sullivan, 928 F.2d 255, 259 n.3 (8th Cir. 1991) (citation omitted). The general rule is not ironclad; a treating physician's opinion may be disregarded if it is unsupported by clinical or other data or is contrary to the weight of the remaining evidence in the record. E.g., Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996).

Here, it is not clear that Dr. Ball qualifies as a treating physician. While not dispositive, it is interesting that when asked to identify the doctor providing her with primary care Plaintiff did not identify Dr. Ball. The gaps in time during which Plaintiff sought care from other doctors instead of Dr. Ball deprives him of the familiarity that justifies deference. Of particular importance is the fact that Plaintiff had not seen Dr. Ball for nine months before he completed the medical source statements.

Even if Dr. Ball were regarded as Plaintiff's treating physician, his medical source statements are not supported by his treatment notes. First, there are no contemporaneous treatment notes: as stated, Plaintiff had not seen Dr. Ball for nine months. Second, the Dr. Ball's treatment notes do not reflect the degree of limitations described in his medical source statements. These discrepancies justified the ALJ's decision not to defer to Dr. Ball's opinion.

C.

Plaintiff's final argument is that the ALJ erred in not finding her testimony credible. The critical issue is not whether Plaintiff experiences pain, but rather the degree of pain that she experiences. House v. Shalala, 34 F.3d 691, 694 (8th Cir.1994). The familiar standard for analyzing a claimant's subjective complaints of pain

6

is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
>     1. The claimant's daily activities;
>     2. the duration, frequency and intensity of the pain
>     3. precipitating and aggravating factors;
>     4. dosage, effectiveness and side effects of medication;
>     5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

739 F.2d at 1322. Current regulations incorporate these considerations, but the Eighth Circuit has declared that the "preferred practice" is to cite Polaski. Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007).

The Court accepts Plaintiff's argument that her subjective complaints of pain cannot be discounted or ignored simply because they are not fully corroborated by objective medical evidence. Nonetheless, objective medical evidence remains a factor to be considered. In addition, the ALJ was entitled to rely on the fact that Plaintiff's

testimony described limitations that had not been reported to any of her doctors. While she complained of pain in her knee, hips, back and head, she never told doctors she was unable to sit, was bedridden for three to four days a week, had difficulty seeing or remembering things, or that she walked into walls. Significantly, there is nothing in the Record confirming – and there is substantial evidence in the Record contradicting – Plaintiff's claim that she cannot sit long enough to perform sedentary work. The ALJ's findings are largely consistent with Plaintiff's description of her daily activities – which are also inconsistent with her claimed disabilities.

### III. CONCLUSION

For these reasons, the Commissioner's final decision is affirmed.

IT IS SO ORDERED.

DATE: December 10, 2010

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
UNITED STATES DISTRICT COURT